UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| SAMARA R. COSSAIRT | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:16-cv-2607 |
| | ) | Chief Judge Crenshaw |
| JARRETT BUILDERS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Samara R. Cossairt ("Cossairt") was hired as a laborer by Jarrett Builders, Inc. ("Jarrett") in January 2015, and, on April 1, 2015, was promoted to foreman. Less than a year later she was fired, ostensibly because of conflicts with other employees and her inability to perform the duties of a foreman.

Viewing the reason for her termination differently, Cossairt filed suit in the Circuit Court for Davidson County, Tennessee, alleging sexual discrimination and harassment, unequal pay, and the intentional infliction of emotional distress. After the case was removed to this Court and Cossairt's deposition had been taken, Jarrett moved for summary judgment on her harassment and intentional infliction of emotional distress claims. In addition to the Motion for Partial Summary Judgment (Doc. No. 16) and accompanying Memorandum of Law (Doc. No. 17), Jarrett filed a Statement of Undisputed Material Facts (Doc. No. 1) containing 75 paragraphs. In response, Cossairt filed her own Memorandum of Law (Doc. No. 26), along with a Declaration (Doc. No. 27-2) that largely serves as the basis for her own Statement of Additional Undisputed Facts (Doc. No. 27) containing 66 paragraphs. Jarrett then filed a reply (Doc. No. 38).

1

Typically, this Court begins its analysis of a summary judgment motion by setting forth the undisputed facts and noting any facts that may be in dispute. That approach is neither practical nor efficient in this case.

Not only are the combined 141 paragraphs (and an equal number of responses) somewhat unwieldy for an uncomplicated single plaintiff employment case, they set forth a widely divergent view of the working atmosphere at Jarrett. More importantly, Cossairt's Declaration is the subject of a Motion to Strike (Doc. No. 31) by Jarrett that produced yet another round of briefing (Doc. Nos. 32, 35 & 38). Because resolution of that Motion is effectively outcome determinative of the partial motion for summary judgment as it relates to Cossairt's sexual harassment claim, the Court turns to it first.

## I. **Motion to Strike**

Jarrett took Cossairt's deposition on June 26, 2017. Four months later, Cossairt filed her Declaration.

Jarrett moves to strike Cossairt's Declaration on the grounds that it "attempts to contradict much of Cossairt's earlier deposition testimony and tries to breath life into her hostile workplace claim and her claim for the intentional infliction of emotional distress." (Doc. No. 31 at 1). Not only should the Declaration be stricken Jarrett argues, attorney's fees and expenses should be awarded "as a result of the bad faith submission of that Declaration." (Id. at 2). The Court disagrees.

### A.

Federal courts "have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous

sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999) (collecting cases). To address the problem, courts, including the Sixth Circuit, have developed the "sham affidavit doctrine" which "prevents a party from submitting a new affidavit to manufacture a factual dispute by contradicting an earlier testimony." Webb v. United States, 789 F.3d 647, 660–61 (6th Cir. 2015).

Not every post-deposition affidavit or declaration is prohibited, however. Rather, a distinction must be made between legitimate efforts to supplement or clarify the record, and attempts to create sham issues to stave off summary judgment and force an unnecessary trial.

The sham affidavit doctrine was discussed in detail by the Sixth Circuit in Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899, 907–08 (6th Cir. 2006). After noting the law in other circuits, the court wrote:

> [A] district court deciding the admissibility of a post-deposition affidavit at the summary judgment stage must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony. . . . A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction. . . . If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit "constitutes an attempt to create a sham fact issue."

Id. at 908 (internal citations omitted). With regard to the issue of whether the affidavit attempts to create a sham issue of fact, the Aerial court went on to endorse a "non-exhaustive list of factors" that asks "'whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain.'" Id. at 908-09 (quoting Franks v. Nimmo, 796 F.2d 1230, 1237 (10th

3

Cir.1986)).

This Court has read Cossairt's 359 page deposition and the accompanying 53 pages of exhibits in conjunction with her 15 page, 46 paragraph Declaration. Based upon that review, the Court finds that Cossairt's Declaration is generally consistent with, and an amplification of, her prior deposition testimony, and was not submitted simply in an effort to forestall the entry of judgment against her.

## B.

Jarrett's Motion to Strike is premised primarily on the argument that Cossairt stated in her deposition that she did not believe that she had been sexually harassed during the time she was a laborer, yet, in her Declaration, she points to incidents prior to March 30, 2015 (before she became a foreman) as supporting her sexual harassment claim. Cossairt's statements on this issue do not directly contradict her deposition testimony.

To the contrary, while Cossairt replied "no" to the question of whether she believed she was sexually harassed while a laborer, she also explained that it took her a while to realize exactly what was going on and that the harassment "built up. So there was times I believe I was but didn't really start until I became a foreman.." (Doc. No. 18-3, Cossairt Depo. at 131). Cossairt also elaborated on this point later in her deposition. When asked why she did not complain to Jason Jarrett, the owner of the company, when she met with him early in her employment, she explained:

> Q. But my question is, what was on – Why didn't you tell him what was on your mind? If at that point you were sexually harassed, why didn't you tell him that?
>
> A. In the beginning, I didn't – I didn't – I didn't feel that as much. It eventually – it brought me down slowly. It took me a long time to realize what I was actually going through, and it took me – still to this day, I – I'm still getting over it. I – I didn't know at the time. I though that I what I was being put through and dealing with was just part of working with men, and I wanted to fit in, so I didn't at the time

4

realize I was being sexually harassed.

(Id. at 145).

"Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002). Absent egregious and exceptional circumstances, it is a cumulative series of acts or comments that build up subjectively and create objectively an alleged hostile work environment. The Court will not disregard what Cossairt claims occurred as a laborer simply because she may not have recognized it as sexual harassment at the time.

Jarrett also argues that, in several of the paragraphs of her Declaration, Cossairt claims she "made clear to [her] supervisor Steven Cook" that various comments were not appropriate when, in fact, "Cossairt did not testify that she had told Cook or anyone else with Defendant that she considered the comments to be inappropriate or unwelcomed." (Doc. No. 32 at 3). As sole support for the argument, Jarrett relies on Cossairt's deposition responses to questions relating to Cook's alleged comments about "beating the brakes"[1] off of females. Jarrett argues Cossairt's responses are in "keeping with" her testimony about objecting to inappropriate statements:

> Q. Now did you – did you tell him not to say this kind of stuff?
>
> A. I – yeah, Yes. I – I'd give him a disgusted look and kind of walk away and almost just laugh at -- not – like, an awkward confusion as "Do you think that's funny? Do you think that's okay?" And he would just kind of smile at me like it was no big deal.
>
> \*             \*             \*
>
> Q. So you directly told him to stop?

---

[1] Cossairt stated that the crew understood "beating the brakes off" of someone to be a reference to sexual intercourse.

> A. Yes. Maybe not "stop." Maybe, like I said, this is how rumors get started, why are you doing this, what – I mean, I didn't use the word "stop."

(Doc. No. 27-2 Cossairt Depo. at 289-90). Such testimony does not directly contradict Cossairt's statement in her Declaration that she endeavored to make clear to Cook that the comments were unwelcomed.

Furthermore, in setting forth the foregoing colloquy, Jarrett omits the following exchange between counsel and Cossairt:

> Q. Did you ever tell him not to say this anymore? I mean – and I don't mean like giving him the look. I mean actually say, "Don't talk like that in front of me., don't talk – I'm offended by that." Anything like that?
>
> A. I'm sure I did a couple of times. Not as much as I wish I would have.

(Id. at 290). Whatever discrepancies there may be between what Cossairt said in her deposition and her Declaration on this issue may be the fodder for cross-examination, but it is hardly a sufficient basis to strike Cossairt's Declaration in its entirety.

Jarrett also argues that Cossairt's Declaration contradicts her deposition testimony about how she felt when Brian Duncan (Cook's superior) allegedly asked her out on a date. Jarrett notes that, in her Declaration, Cossairt claims Duncan's request "affected her job performance" and "she made it clear to him this was unwelcomed," but "she did not say any such thing during her deposition testimony on this topic." (Doc. No. 32 at 4). As support, Jarrett relies upon the following exchange:

> Q. . . . Brian Duncan asked you out on a date, Was he joking in your estimation or not?
>
> A. He wasn't joking. He tried to play it off like he was joking when he was – I felt like he was putting the feelers out there to see what my reaction was, but said it in a certain way that he could act like he didn't meant it – or mean it when I responded to him.

6

Q. Okay. Did you find that to be sexually offensive when he did that?

A. Not sexually, but offensive.

      \*      \*      \*

Q. . . . Okay. So if he's done what you have said, he's asked you out, putting feelers out there, and you feel offended by that –

A. Mm-hmm.

Q. -- why would you let him work with you in music?

A. Because I didn't understand it then. I thought that – I didn't accept it then. I tried to just think – I was surrounded by guys that are always joking about cheating on their wives or doing this or, you know, whatever, and I thought he was just talking at the time, and I – I didn't understand it. And now looking back at this mess, I do. . . . But now that I've had a taste of better people in different companies, I would never do that again.

(Doc. No. 27-2, Cossairt Depo. at 151-52).

The foregoing does not show that Cossairt's Declaration directly contradicts her deposition testimony. Quite the opposite; she testified that, while she may not have found Duncan's request sexually offensive, she was offended by it and felt it to be inappropriate. Furthermore, Cossairt cannot be faulted for failing to answer a question that was not asked, to wit, whether she felt Duncan's request affected her job performance.

The failure to ask the right questions also leads the Court to conclude that Cossairt's Declaration should not be stricken insofar as it supports her intentional infliction of emotional distress claim. True, Cossairt's Declaration goes into a litany of complaints about the physical and emotional toll the alleged harassment had on her, only a very minute portion of which was discussed at her deposition. However, the focus of the questioning at the deposition was largely on what Cossairt did or did not tell her physician and other medical providers, and the prescriptions she may

7

have received.

Counsel began the questioning by noting that "part of the lawsuit says that there are emotional injuries," and then referenced a Vanderbilt University medical report. The questioning thereafter did not drill down into the basis for Cossairt's claim of anxiety, loss of sleep, extreme embarrassment, mood swings, crying, spells and depression, as alleged in the Amended Complaint. Instead, Cossairt primarily was asked whether she told her doctors about her emotional health and whether any medical professional had told her that her emotional state was due to her having worked at Jarrett.

The deposition preparation checklist for every competent litigator instructs the deponent not to volunteer information and to tell the truth. A "deponent is under no obligation to volunteer information not fairly sought by the questioner," and nothing "prevent[s] a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit. Such an affidavit fills a gap left open by the moving party and thus provides the district court with more information, rather than less, at the crucial summary judgment stage." Aerel, 448 F.3d at 907.

Accordingly, the Court will not strike Cossairt's declaration.

## C.

Because Cossairt's Declaration will not be stricken, Jarrett's additional request for attorney's fees and expenses must be denied. Nor will the Court award such fees and expenses to Cossairt under Rule 11 of the Federal Rules of Civil Procedure because Jarrett raised legitimate concerns about the efficacy of Cossairt's post-deposition Declaration. See Jones v. Illinois Cent. R. Co., 617 F.3d 843, 854 (6th Cir. 2010) (noting that "a court may sanction an attorney who presents court

filings for an improper purpose or based on frivolous arguments"); Tahfs v. Proctor, 316 F.3d 584, 594 (6th Cir. 2003) (observing that "the central purpose of Rule 11 is to deter baseless filings in district court").

## II. Motion for Partial Summary Judgment–Sexual Harassment Claim

Having decided not to strike Cossairt's Declaration, the Court can resolve Jarrett's Motion for Partial Summary Judgment on her sexual harassment/hostile work environment claim with relative dispatch.[2] Notwithstanding Jarrett's arguments to the contrary, the allegations contained in the Declaration coupled with Cossairt's deposition testimony provide more than an adequate basis from which a reasonable jury could conclude that she was subjected to unlawful sexual harassment in violation of both Title VIII, 42 U.S.C. § 2000e *et seq*. and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-12-101 *et seq*. To succeed under either statute, Cossairt must demonstrate that:

> (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [her protected status], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

Williams v. CSX Transp. Co., 643 F.3d 502, 511 (6th Cir. 2011) (Title VII); Bazemore v. Performance Food Grp., Inc., 478 S.W.3d 628, 636 (Tenn. Ct. App. 2015) (THRA).

In determining whether conduct is severe or pervasive, a court is to consider the "totality

---

[2] From the filings, it is clear that the parties understand the standard of review for a motion for summary judgment. Therefore, it suffices to note that (1) summary judgment is only appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a); (2) the facts and inferences must be construed in favor of the nonmoving party, Van Gorder v. Grand Trunk W. R.R., Inc., 509 F.3d 265, 268 (6th Cir. 2007); (3) the Court does not weigh the evidence, or judge the credibility of witnesses when ruling on the motion, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); and (4) the mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment, Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003).

of the circumstances," utilizing both an objective and subjective test. Clay v. United Parcel Serv., Inc., 501 F.3d 695, 707 (6th Cir. 2007) (citation omitted); Williams v. General Motors, 187 F.3d 553, 562 (6th Cir. 1999). "[I]n other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim." Randolph v. Ohio Dept. of Youth Serv's, 453 F.3d 724, 733 (6th Cir. 2006). Factors to be considered include "'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance.' " Id. (quoting, Harris, 510 U.S. at 23).

**A.**

Jarrett first argues that Cossairt cannot show that any alleged harassment was unwelcomed or that she subjectively perceived herself to be the subject of harassment. This is important because the Supreme Court has held that "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcomed," Meritor Savings Bank v. Vinson, 477 U.S. 57, 68 (1986) and that, "[i]f the victim does not subjectively perceive the environment as abusive, the conduct has not actually altered the condition of the victim's employment, and there is no Title VII violation," Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993).

Certainly support for Jarrett's position can be found in Cossairt's deposition testimony because she admitted to engaging in off-color banter with other employees, injecting sexuality into her communications with them, and initiating social communications via text messaging with her co-workers. Further, even after she left Jarrett's employment, Cossairt continued to socialize and engage in electronic communication with some of her former co-workers. Most notable in this regard is a posting to her Facebook page (with accompanying photographs of some co-workers) that read:

10

> Goodbye to my days as a foreman with Jarrett Builders. Sometimes the bad things that happen in our lives put us directly on the path to the best things that will ever happen to us. I sincerely value the people I got to work with along the way. Being the "girl" out in the field is actually awesome due to the fact that I was surrounded by an oversized family of good-hearted men. I feel grateful that I got to create a relationship with each of you guys, and I especially appreciate the times that I could tell you were looking out for me . . . whether it was Wesley Hodge threatening to knock out some rude laborers, Daniel Caughey encouraging me to take no shit from a pervert, or Ricky Clark landing me a brand new job just an hour after leaving. Still, that doesn't even cover it. This is a little longwinded … but I'm really going to miss seeing you guys, so I wanted you to know how much I enjoyed working with you all. Love you guys.

(Doc. No. 18 at 16).

On the other hand, however, Cossairt -- the only female working in the field for a large construction company – also testified in her deposition that, at first she was trying to fit in, but over time found the repeated sexual comments, innuendos, and overtures troubling. This is confirmed in her Declaration.

After describing a workplace that was rife with inappropriate behavior led by her own supervisor, Cossairt stated:

> This harassment continued to build up over time, and continued consistently throughout my time of employment with Jarrett Builders. I was made to feel that I was viewed as a sex object, and not for my job performance. I was like a mascot to them. I was not taken seriously as an employee. This continued harassment brought be down slowly throughout my employment with Jarrett Builders. The continued harassment took its toll on me, and I am still dealing with theses issues. I realized that when each of these incidents occurred that I was being sexual harassed. However, it took time and a volume of incidents for me to more fully understand how bad and demeaning the sexual harassment was at Jarrett Builders. . . .

(Doc. No. 27-2, Cossairt Decl. ¶ 35). Besides, "[w]hether Plaintiff subjectively viewed the alleged harassment as severe and pervasive 'is quintessentially a question of fact," Williams v. E. I. Du Pont De Nemours & Co., Inc., No. 215CV02111STADKV, 2016 WL 5416538, at *10 (W.D. Tenn. Sept. 28, 2016) (citation omitted), making "the issue of whether the [alleged harasser's] behavior was

11

welcomed by the complainants . . . ripe for argument to a jury[,]" E.E.O.C. v. Donohue, No. 2:09CV1280, 2011 WL 4572020, at *19 (W.D. Pa. Sept. 30, 2011). See Terry v. 7700 Enterprises, LLC, No. 09-CV-529-TCK-PJC, 2010 WL 5420151, at *6 (N.D. Okla. Dec. 27, 2010) ("Stated simply, Plaintiff's subjective perception of [a co-worker's] conduct involves questions of fact that are best left for the jury and are not appropriate for summary judgment disposition."); Miller v. Sweetheart Cup Co., No. 1:96-CV-0111-JEC, 1998 WL 1971459, at *4 (N.D. Ga. Mar. 30, 1998)(observing that plaintiff can "create[] a question of fact as to the subjective element of this requirement by claiming that she was 'offended, humiliated, embarrassed and angered' by the actions" or comments).

**B.**

Jarrett also argues that Cossairt's sexual harassment claim fails because Jarrett has an anti-harassment policy and Cossairt failed to take advantage of that policy. Leaving aside the issue of whether Cossairt directly complained to Jason Jarrett, there are factual questions on this issue as well.

There is no dispute that Jarrett has a "Workplace Anti-Harassment Policy" (Doc. No. 18-3 at 317), which is contained in Jarrett's Employee Handbook. However, Cossairt claims she did not receive the policy until months into her employment, and did not receive training on the policy. See Clark v. United Parcel Serv., Inc., 400 F.3d 341, 349–50 (6th Cir. 2005) (noting that there are several factors used to determine if an anti-harassment policy is effective, including whether the employer "provide[s] for training regarding the policy"); Mays v. Music City Record Distrib., Inc., No. M2006-00932-COA-R3CV, 2007 WL 2198240, at *5 (Tenn. Ct. App. July 27, 2007) (applying Clark factors to a claim under the THRA).

It is also undisputed that the Employee Handbook also contains a "Grievance/Complaint Policy that, in relevant part, provides:

> In the event an employee experiences any job-related discrimination or harassment based on . . . gender . . ., or believe they have been treated in an unlawful, discriminatory manner or have been unlawfully harassed, promptly report the incident to your supervisor or upper management. Once made aware of your complaint, Jarrett Builders, Inc. is committed to commence an immediate, thorough investigation of the allegations. Complaints will be kept confidential to the maximum extent possible.

(Id. at 402). Even leaving aside Cossairt's contention that she was effectively told by Jason Jarrett to handle any problems with Cook herself, she claims that she told Cook that his statements and/or advances were unwelcome and, under the policy it was his duty to report it up the chain of command.

In any event, under the Supreme Court's decisions in Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998) and Burlington Industries Inc. v. Ellerth, 524 U.S. 742, 765 (1998), (collectively "Faragher/Ellerth"), liability may be imposed on an employer where a supervisor engages in workplace harassment that leads to a tangible employment action. That is exactly Cossairt's allegation in regard to Cook.

Summary judgment will not be granted on Cossairt's sexual harassment claim.

**B. Intentional Infliction of Emotional Distress/Outrageous Conduct Claim**

Under Tennessee law, the intentional infliction of emotional distress and the tort of outrageous conduct are different names for the same cause of action. Bain v. Wells, 936 S.W.2d 618, 622 n. 3 (Tenn. 1997). To establish such a claim, a plaintiff must show "that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." Rogers v. Louisville Land Co., 367

S.W.3d 196, 205 (Tenn. 2012) (citing Lourcey v. Estate of Scarlett, 146 S.W.3d 48, 51 (Tenn. 2004)).

"Although no perfect legal standard exists for determining whether particular conduct is so intolerable as to be tortious, [the Tennessee Supreme Court] has adopted and applied the high threshold standard described in the Restatement (Second) of Torts[.]" Bain, 936 S.W.2d at 623. The Restatement standard is as follows:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

RESTATEMENT (SECOND) OF TORTS, Section 46, Comment D. The Tennessee Supreme Court has also "stressed" that "it is the court's duty in the first instance to apply that standard and determine "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." Bain, 936 S.W.2d at 623 (citing Medlin v. Allied Inv. Co., 398 S.W.2d 270, 274 (1966)).

Jarrett raises a serious question as to whether Cossairt can establish the third element, to wit, "a serious or severe mental injury" such that "a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." Rogers, 367 S.W.3d at 209. This remains so even though (1) the Tennessee Supreme Court in Rogers held that the serious mental injury may be established by a plaintiff's "own testimony, the

testimony of lay witnesses acquainted with the plaintiff such as family, friends, and colleagues, or by the testimony of medical experts," (2) that court set forth list of "nonexclusive factors that inform the analysis," and (3) Cossairt endeavored to address most of those factors in her in her post-deposition Declaration. See Reagan v. City of Knoxville, 692 F. Supp. 2d 891, 906 (E.D. Tenn. 2010) (noting that "[e]xpert testimony is not necessary to establish the existence of a serious mental injury" but also that "the mental injury must be "so severe that no reasonable person would be expected to endure it"). Nevertheless, the Court need not decide this question because, even accepting Cossairt's allegations as true, she has failed to establish the outrageousness element.

"The standard for outrageous conduct is high, indeed," Levy v. Franks, 159 S.W.3d 66, 85 (Tenn. Ct. App. 2004), and cases finding conduct sufficient to support an intentional infliction of emotional distress claim are few and far between. Often cited in this regard is Johnson v. Woman's Hosp., 527 S.W.2d 133 (Tenn. Ct. App. 1975) where a mother was shown her deceased premature baby in a gallon jar of formaldehyde; Dunbar v. Strimas, 632 S.W.2d 558 (Tenn.Ct.App.1981), where a mother (who had recently had a nervous breakdown) was told her infant daughter had been sexually abused and there was a large tear in her rectum where sperm cells were found, when, in fact, the child had suffered a "crib death," and Dunn v. MotoPhoto, Inc., 828 S.W.2d 747 (Tenn. Ct. App. 1991) where plaintiff was told that her film could not be developed when, in fact, it had been developed and nude photographs of plaintiff were shown to other employees and plaintiff's acquaintances. Another example is Lourcey v. Estate of Scarlett, 146 S.W.3d 48 (Tenn. 2004) where a postal worker suffered post-traumatic stress disorder after coming across a semi-nude woman in the middle of the street, was told by the husband that his wife was having a seizure, and, when the postal employee used her cellphone to call 911, witnessed the husband shoot his wife in

the head and then turned the gun on himself, committing suicide.

Viable claims for outrageous conduct in the employment complex are rarer still. "It is clear that not every sexual harassment claim will automatically give rise to an IIED claim, even though, to some extent, all instances of sexual harassment can be considered outrageous." Stacy v. MVT Servs., LLC, No. 3:11-CV-01241, 2012 WL 2281495, at *8 (M.D. Tenn. June 18, 2012) (citing Arnett v. Dominos Pizza, I, LLC, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003)). Because "[o]utrageous conduct claims are not evaluated in a vacuum" and "are evaluated in light of the category of conduct alleged, . . . [s]exual harassment will only support an outrageous conduct claim when the harassment alleged is especially heinous compared to other sexual harassment claims." Id. (citing Briordy v. Chloe Foods Corp., 2008 WL 587503 at *10 (M.D. Tenn. Feb.29, 2008)). "Thus, even where courts permit claims of harassment or retaliation to proceed under state and federal statutes, courts will not permit IIED claims to proceed in most employment discrimination cases; this approach applies even where a defendant or its employees engaged in highly reprehensible conduct or otherwise intended to cause the plaintiff to suffer emotional distress." DeSoto v. Bd. of Parks & Recreation, 64 F. Supp. 3d 1070, 1096 (M.D. Tenn. 2014) (footnote omitted, collecting cases).

In support of her position, Cossairt cites two cases that arose in the employment setting, Pollard v. E.I. Dupont De Nemours Inc., 412 F.3d 657, 664 (6th Cir. 2005) and Strong v. HMA Fentress Cty. Gen'l Hosp., LLC, 194 F. Supp.3d 685 (M.D. Tenn. 2016). Both, however, are readily distinguishable.

In Strong, the Court was presented with a situation in which plaintiff alleged that her supervisor, Kevin Crabtree, engaged in "'ongoing and contiun[ing] sexual harassment,' that began

by Crabtree invading Plaintiff's personal space 'to an uncomfortable degree' and then progressed, with Plaintiff alleging that Crabtree (1) 'leaned his penis into Plaintiff's buttocks area'; (2) blatantly and continually stared at her breasts, instead of looking in her face; (3) inquired into whether she and her husband were 'having marital difficulties'; (4) 'attempt[ed] to gain control over [her] cell phone in order to check her personal text messages and pictures'; (5) 'visit[ed] a restaurant where Plaintiff's minor daughter worked'; (6) follow[ed] Plaintiff around the [workplace]; (7) repeatedly ma[de] 'inappropriate comments'; and (8) 'call[ed] out Plaintiff's name and gyrat[ed] his pelvis at her.'" 194 F. Supp.2d 690-91. Even under these facts, then-Judge Sharp carefully found the "outrageousness" element to be a "closer call" than the "serious mental injury" element, but allowed the claim to go forward because the matter was before the court on a motion to dismiss where plaintiff's burden was simply to articulate a plausible claim under the notice pleading standard.

In Pollard, plaintiff worked in the hydrogen peroxide area of a Dupont plant. Her intentional infliction of emotional distress claims was based upon years of mistreatment, including the following:

> Co-workers refused to take directions from plaintiff because she was a woman, and placed a Bible on her desk open to the passage, "I do not permit a woman to teach or have authority over man. She must be silent."
>
> After DuPont implemented a "take your daughter to work day," an email titled "Bull Mularky" that took issues with the program was circulated at the plant. Thereafter, employees were instructed by the control room operator "not to eat with [plaintiff], share food with her, be in the break room with her, talk to her," or take instructions from her without consulting him first.
>
> At least five times a week the control room operator stated that he did "not approve of women working in the peroxide department," and "consistently, and routinely referred to women as 'bitches,' 'cunts,' 'heifers,' and 'split tails.'" Several other men in the department also used such "terms to refer to women in general and to plaintiff in particular."

17

> The inappropriate conduct was brought to management's attention, but the control room operator "made it plain he was not going to change his behavior," and nothing was ever done about it.
>
> After this ineffective counseling, "the situation worsened," with the control room operator setting off fire alarms in plaintiff's work areas, and co-workers turning up the stove to burn the food plaintiff was cooking.
>
> Worker's also repeatedly sabotaged plaintiff's work area, such that it made it appear plaintiff was not doing her job.
>
> The tires on the bicycle plaintiff used to get around the plant were slashed.
>
> When plaintiff claimed the control room operator tried to run her off the road, he "got in plaintiff's face" and said, "[n]obody in this area likes you, you're here all alone, it's all your own fault." A manager who was present for this exchange did nothing to de-escalate the situation.
>
> Plaintiff was "afraid for her safety and was concerned that a dangerous situation might arise in the peroxide area of which the men would not inform her."
>
> When plaintiff went on short-term disability leave for six months based in part on the advice of Dupont's psychologist, the company would not guarantee that she would not be placed on the same shift as her chief tormenter, the control room operator.
>
> After again finding Bible verses about the supposed superiority of men and unable to take it anymore, plaintiff left her employment, prompting the entire shift hold a party and fish fry.

412 F.3d at 660-63. In an earlier opinion involving the same facts, the Sixth Circuit observed that this "sort of daily, consistent harassing behavior which [plaintiff] endured over a period of months and years has been characterized as a type of slow torture." Pollard v. E.I. Dupont de Nemours Co., 213 F.3d 933, 947 (6th Cir. 2000).

In contrast to both Pollard and Strong, the facts Cossairt presents, even if true, "are, unfortunately, not atypical of the fact pattern presented in most harassment cases[.]" Briordy, 2008 WL 587503, at *9–10 (M.D. Tenn. Feb.0 29, 2008). As a matter of law, those fact are insufficient to support an intentional infliction of emotional distress claim under Tennessee law.

18

In so ruling, the Court notes that there is a lot to be said for Cossairt's contention that "[f]or a male supervisor to say to a female employee in front of another worker that she could 'take a shovel two feet inside of her,' to tell employees that Plaintiff has a 'stinky vagina' and to state to a male employee while Plaintiff was in listening distance that he wanted to take her into the woods to have sex with her is conduct which cannot be tolerated in a civilized society – this is 2017 – the age of Harvey Weinstein." (Doc. No. 26 at 22). However, liability for the intentional infliction of emotional distress "does not extend to mere insults [and] indignities," Bain, 936 S.W.2d at 622, and this includes words that are "mean and hurtful." Regan v. City of Knoxville, 629 F. Supp. 2d 891, 907 (E.D. Tenn. 2010). Because "plaintiff's burden to demonstrate outrageous conduct 'is not an easy burden to meet,'" Brown v. Mapco Exp., Inc., 393 S.W.3d 696, 703 (Tenn. Ct. App. 2012) and Cossairt has not carried that burden, summary judgment will be granted on her intentional infliction of emotional distress claim.

### III. Conclusion

On the basis of the foregoing, Jarrett's Motion for Partial Summary Judgment will be granted with respect to Cossairt's intentional infliction of emotional distress claim, but denied with respect to her sexual harassment/hostile work environment claim.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

19